IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>$800,000 SEIZED FROM WELLS FARGO ACCOUNT ENDING IN 5799,<br><br>Defendant In Rem. | Civil No. 1:21-cv-_____ |

### VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

COMES NOW the plaintiff, United States of America, by and through its counsel, Raj Parekh, Acting United States Attorney for the Eastern District of Virginia, and Kevin Hudson and Annie Zanobini, Assistant United States Attorneys, and brings this complaint and alleges as follows in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

### NATURE OF THE ACTION

1. The United States brings this action *in rem* seeking the forfeiture of all right, title, and interest in the defendant *in rem* identified in the case caption above (the "defendant property").

2. The United States' claim arises from a scheme to defraud Company #1, and the defendant property constitutes the proceeds of violations of 18 U.S.C. § 1343 (Wire Fraud and Honest Services Wire Fraud) and 18 U.S.C. § 1349 (Wire Fraud Conspiracy), as well as property involved in violations of 18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering), and 18 U.S.C. § 1956(h) (Money Laundering Conspiracy), and is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) and § 981(a)(1)(C).

## THE DEFENDANTS IN REM

3. The defendant property was seized on May 21, 2020, from a Wells Fargo Bank account ending in 5799 in the Eastern District of Virginia. The Wells Fargo Bank account ending in 5799 is in the name of Company #5. The defendant property is currently in the possession of the United States Marshals Service in Richmond, Virginia.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over actions commenced by the United States under 28 U.S.C. § 1345, and over forfeiture actions under 28 U.S.C. § 1355(a) and (b).

5. This Court has *in rem* jurisdiction over the defendant property under 28 U.S.C. § 1355(b)(1)(A) because the acts and omissions giving rise to the forfeiture took place in the Eastern District of Virginia.

6. Venue is proper within this judicial district under 28 U.S.C. § 1355(b)(1)(A) because the acts and omissions giving rise to the forfeiture took place in the Eastern District of Virginia.

## FACTUAL ALLEGATIONS

7. The Federal Bureau of Investigation ("FBI") is investigating a fraudulent kickback scheme involving individuals employed by Company #2, a Denver, Colorado-based commercial real estate and development company, as well as Company #3, Company #4, and certain former employees at Company #1. Person #7, whose activities are described in more detail below, helped the recipients of these kickbacks launder them in order to conceal the nature, source, ownership, and control of those kickbacks.

8. Casey Kirschner and Carleton Nelson oversaw real estate development in Northern Virginia, within the Eastern District of Virginia, for Company #1 (commonly doing

business under a third-party company name) for its data centers. Until in or around June 2019, Carleton Nelson was Casey Kirschner's supervisor at Company #1.

9. Casey Kirschner and Carleton Nelson were two of the primary decision-makers for Company #1 in Northern Virginia for its real estate site identification and selection, as well as selection of specific developers, including Company #2.

10. Since 2018, Company #1 has executed leases with Company #2 for nine Company #1 data centers in Northern Virginia, with a total approved to be spent for these deals of approximately $415.5 million.

11. The scheme involving Company #2 included referral payments it made to an entity called the Villanova Trust, which was controlled by Person #1, who is Casey Kirschner's brother, in exchange for steering Company #1 data center deals in Northern Virginia to Company #2.

12. Person #2, who was the Chief Executive Officer of Company #2, and Person #1 had entered into a contractual agreement whereby Company #2 would pay Person #1 a portion of the various fees it received on its Company #1 data center deals in Northern Virginia. Person #1 knew a portion of the referral fees paid to Person #1 via the Villanova Trust would be transferred to Casey Kirschner and Carleton Nelson for the purposes of securing the development deals with Company #1 in Northern Virginia.

13. From in or about March 2018 to in or about August 2019, financial records indicated that Company #2 wired the Villanova Trust approximately $5,112,983.84.

14. In turn, from in or about August 2018 to in or about August 2019, Person #1, doing business as the Villanova Trust, wired approximately $3,375,625 to a bank account at First Western Trust Bank account ending in 3698 established in the name of the 2010 Irrevocable

Trust, which was maintained by Person #7 on behalf of Casey Kirschner and Carleton Nelson ("2010 Irrevocable Trust bank account").

15. The investigation uncovered additional fraudulent payments that Casey Kirschner and Carleton Nelson, in conjunction with their employment with Company #1, received from at least two other real estate companies, Company #3 and Company #4.

16. Company #1 employees were not authorized to benefit from "referral fees" or other financial compensation paid by Company #2, Company #3, Company #4, or any other entities, related to Company #1's real estate development projects.

17. Casey Kirschner has admitted to accepting funds from Company #2 associated with his job with Company #1 and that the CEO of Company #2, Person #2, paid the kickbacks to the Villanova Trust associated with Company #1's development deals in Northern Virginia.

18. In addition to the kickback payments received from Company #2 via the Villanova Trust, in 2019, Casey Kirschner and Carleton Nelson received $1,000,000 in kickbacks from Company #3 and $4,818,955.50 in kickbacks from Company #4 associated with their obligations on behalf of Company #1's projects in Northern Virginia, as further described below.

19. On or about February 18, 2019, a Company #2 employee, Person #3, doing business as Company #3, entered into a "Confidentiality, Non-Disclosure, and Non-Circumvention" agreement with Seller #1, a Loudoun County, Virginia, landowner, for the acquisition of approximately 89 acres of vacant land located in the Eastern District of Virginia. Person #3, doing business as Company #3, ended up "flipping" the land that was the subject of the agreement with Seller #1 to Company #1 for a substantial profit, as described below.

20. Casey Kirschner and Carleton Nelson used their positions as a Company #1 employee responsible for overseeing real estate development in Northern Virginia to steer Company #1 into acquiring the land at an inflated price that Person #3, doing business as Company #3, had placed under contract with Seller #1.

21. On or about May 29, 2019, Casey Kirschner submitted a written proposal to Company #1's management recommending that Company #1 acquire the land that Person #3, doing business as Company #3, had put under contract with Seller #1. Casey Kirschner's executive summary detailing the proposed acquisition contained materially false statements regarding the subject property.

22. On or about July 29, 2019, Company #3 acquired the land for approximately $98,670,000 and instantly resold it, or "flipped" the property, to Company #1 for approximately $116,389,000, which resulted in a gross profit of approximately $17,719,000 to Company #3, which was comprised of Person #3 and Person #4, who was also a Company #2 employee at the time.

23. Following the closing of the real estate transaction described above, Person #3 and Person #4 agreed to transfer payment to Casey Kirschner and Carleton Nelson via a wire transfer utilizing a bank account belonging to a civil engineering consultant, Person #5, who had provided consulting services for both Company #3 and Company #1 on the 89-acre real estate transaction. Person #3 wire transferred $1,000,000 to a bank account belonging to Person #5 to conceal the true purpose of the payment. Person #5 then wire transferred the funds to Person #7, who maintained the account on behalf of Casey Kirschner and Carleton Nelson.

24. Specifically, on or about August 1, 2019, Person #5, doing business as E2M Properties LLC, sent Person #3 an email containing a fraudulent invoice for $983,000 for "Inova

Consulting Services." On or about August 2, 2019, Person #5 sent Person #3 the wiring instructions associated with the wire transfer. On or about August 8, 2019, Person #3 sent a $1,000,000 wire transfer to Person #5's E2M Properties bank account ending in 0762 at Capital One Bank. Then, on or about August 9, 2019, Person #5 sent a $1,000,000 wire to the 2010 Irrevocable Trust bank account, which was maintained for the benefit of Casey Kirschner and Carl Nelson.

25. On or about May 29, 2019, Company #4, which was run by Person #6, put a 100-acre land parcel located in Loudoun County, Virginia, within the Eastern District of Virginia, under contract for $73 million. Records reflect that Casey Kirschner had submitted the $73 million offer on behalf of Person #6 to the seller.

26. On or about May 29, 2019, Casey Kirschner submitted his executive summary to Company #1 management recommending the acquisition of the 100-acre parcel for $110 million. That executive summary also indicated that Casey Kirschner and Carleton Nelson's group within Company #1 had already negotiated an agreement to purchase to the land.

27. On or about that same date, Casey Kirschner and Carleton Nelson documented their formal approvals with Company #1 for the acquisition of the 100-acre parcel, which Person #6 had just put under contract that day for $73 million.

28. On or about December 3, 2019, an attorney for Person #6 forwarded to Casey Kirschner an assignment of the purchase and sale agreement for the 100-acre parcel from Company #4 to Company #1.

29. On or about December 9, 2019, Person #7 submitted a "Finder's Fee" agreement to an attorney for Person #6, which specified that an entity established by Person #7 would receive 50% of the net proceeds paid to Company #4 at closing "in consideration for the Finder's

assisting [Company #4] and being instrumental in identifying the location of the Land and in negotiating the terms of the PSA . . . ."

30. On or about December 23, 2019, a Company #1-related entity acquired the 100-acre parcel from the seller. At closing, Company #1 paid Company #4, which was run by Person #6, a $10 million assignment fee.

31. On or about December 24, 2019, $4,818,955.50 was wire transferred from an account belonging to Person #6 to the 2010 Irrevocable Trust bank account, which was maintained by Person #7 on Casey Kirschner's and Carleton Nelson's behalf.

32. Casey Kirschner later admitted to the FBI that the payment from Company #4 was associated with a deal that Carleton Nelson had "teed up" with Company #1 before he left the company. Casey Kirschner further advised the FBI that Person #6 agreed to split the profits on the deal with Carleton Nelson, operating under a third-party company name. Casey Kirschner also confirmed to the FBI that the $4,818,955 that Company #4 wired to the 2010 Irrevocable Trust bank account also belonged in part to him, Casey Kirschner.

### *Tracing of Fraud Proceeds from the 2010 Irrevocable Trust Bank Account*

33. During the kickback scheme involving the Company #2-developed data center projects for Company #1 in Northern Virginia, the Villanova Trust bank account wired approximately $3,375,625 to the 2010 Irrevocable Trust bank account. The transaction between Seller #1 and Company #3 in Loudoun County, Virginia, involving Company #1 as described above, resulted in a $1,000,000 payment via wire to the 2010 Irrevocable Trust bank account. Company #4's assignment of its purchase and sale agreement to Company #1 for the 100-acre parcel of land located in Loudoun County, Virginia, as previously described above, resulted in a $4,818,955 wire transfer to the 2010 Irrevocable Trust bank account. In all, Carleton Nelson and

Casey Kirschner were paid at least approximately $9,194,580 in fraud proceeds via wire transfers to the 2010 Irrevocable Trust bank account. The 2010 Irrevocable Trust bank account was created, maintained, and controlled by Person #7. Person #7 was the sole signor on the 2010 Irrevocable Trust bank account.

34. Between 2018 and 2020, Person #7 transferred approximately $6,244,442 from the 2010 Irrevocable Trust bank account to another bank account under Person #7's control in the name CTBSRM, Inc. Other than an approximately $49,970 transfer from another account controlled by Person #7, the sole source of funds in the CTMSRM, Inc. bank account resulted from transfers from the 2010 Irrevocable Trust bank account.

35. On or about April 2, 2020, Person #7 caused an $800,000.00 wire to be sent from the CTBSRM Inc. First Western Trust account ending 0525 to Wells Fargo bank account ending 5799, the defendant property, maintained in the name of Company #5. The defendant property represented a retainer payment made by Person #7 to legal counsel, and the funds are entirely traceable to the fraud scheme and conspiracy described in this complaint.

36. On May 21, 2020, the United States seized the defendant property from Company #3's Wells Fargo Bank account ending in 5799.

### FIRST CLAIM FOR RELIEF
### (Forfeiture under 18 U.S.C. §§ 981(a)(1)(C))

37. The United States incorporates by reference paragraphs 1 through 36 above as if fully set forth herein.

38. Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title) or a conspiracy to commit such an offense."

39. Title 18, United States Code, Section 1956(c)(7)(D) provides that the term "specified unlawful activity" includes "an offense under . . . section 1343 (relating to wire fraud)." Title 18, United States Code, Section 1346 also provides that a wire fraud scheme "includes a scheme or artifice to deprive another of the intangible right of honest services."

40. As set forth above, the defendant property constitutes criminal proceeds of the wire fraud and wire fraud conspiracy.

41. As such, the defendant property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

### SECOND CLAIM FOR RELIEF
### (Forfeiture under 18 U.S.C. § 981(a)(1)(A))

42. The United States incorporates by reference paragraphs 1 through 36 above as if fully set forth herein.

43. Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956 . . . of this title, or any property traceable to such property."

44. Title 18, United States Code, Section 1956(a)(1) imposes a criminal penalty on any person who:

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>
> (B)  knowing that the transaction is designed in whole or in part—
>
> > (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

45. Title 18, United States Code, Section 1956(h) imposes a criminal penalty on any person who conspires to commit any offense defined in 18 U.S.C. § 1956.

46. As noted above, "specified unlawful activity" includes wire fraud, which also encompasses honest services wire fraud.

47. As set forth above, the defendant property constitutes property involved in money laundering transactions in violation of 18 U.S.C. §§ 1956(h) and 1956(a)(1)(B)(i), and is therefore subject to forfeiture under 18 U.S.C. § 981(a)(1)(A).

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff requests that judgment be entered in its favor against the defendant property; that pursuant to law, notice be provided to all interested parties to appear and show cause why the forfeiture should not be decreed; that the defendant property be forfeited to the United States of America and delivered into its custody for disposition according to law; that plaintiff be awarded its costs and disbursements in this action; and for such and further relief as this Court may deem just and proper.

Dated: February 19, 2021

Respectfully submitted,

Raj Parekh
Acting United States Attorney

By: /s/ Kevin Hudson

Kevin Hudson
Assistant United States Attorney
Virginia State Bar No. 81420
Attorney for the United States
721 Lakefront Commons, Suite 300
Newport News, Virginia 23606
Office Number: (757) 591-4000
Facsimile Number: (757) 591-0866
Email Address: kevin.hudson@usdoj.gov

## VERIFICATION

I, Randy C. Combs, Special Agent, Federal Bureau of Investigation, declare under penalty of perjury as provided by 28 U.S.C. § 1746, that the foregoing Complaint for Forfeiture in Rem is based on information known by me personally and/or furnished to me by other law enforcement personnel, and that everything contained herein is true and correct to the best of my knowledge.

Executed at Manassas, Virginia, this 19th of February, 2021.

Randy C. Combs
Special Agent
Federal Bureau of Investigation